UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

ROY MITCHELL WAGGONER and
JEWEL KAY WAGGONER,  Case No. 17-11381 t7

Debtors.

**OPINION**

Before the Court is the chapter 7 trustee's motion to compel turnover of three pieces of irrigation equipment, which the trustee alleges are or were estate property. The Court held an evidentiary hearing on the motion on August 25, 2020. Having considered the evidence and the relevant law, the Court concludes that the motion must be denied.

A.  Facts.[1]

The Court finds:

For many years Debtors lived on land in Aztec, New Mexico, that included a house, a barn, and a five-acre field (the "Aztec Property"). The Aztec Property has a well and the right to use water from an irrigation ditch that runs along one side of the property.

In 2012, with assistance of the Natural Resources Conservation Service (NRCS), a part of the United States Department of Agriculture, Debtors decided to install an irrigation system for the field. NRCS helped pay for and design the system, which included a 3-5 horsepower electric pump (the "Field Pump"), underground piping from the irrigation ditch to the field, risers, and two side roll irrigation systems (the "siderolls"). Each sideroll included a 4-wheeled, gas engine powered "Mover." Long metal pipes on wheels were attached to either side of the Mover. At

---

[1] The Court takes judicial notice of its docket in this case. *See Gee v. Pacheco*, 627 F.3d 1178, 1191 (10th Cir. 2010) ("We take judicial notice of court records in the underlying proceedings.").

intervals, sprinklers hung down from the pipes, between the wheels. When assembled, a sideroll extended the width of the field. The Field Pump was designed to pump water from the irrigation ditch, through the underground piping, up the risers, into the sideroll pipes, and out through the sprinklers. With the gas engine running, a Mover was designed to slowly roll the wheeled pipes down the field, irrigating the crops.

Debtors paid about $6,900 for each sideroll in September 2012, which included $3,150 for each Mover. The siderolls and Movers were used when Debtors bought them. The cost of the Field Pump is not in evidence.

In addition to the Field Pump and siderolls, Debtors had a small gas pump they used to water trees on the Aztec Property. The gas pump drew water from the irrigation ditch.

Getting electricity to the Field Pump proved to be financially unfeasible. The only cost-effective option was to run power from a power pole on a neighboring property. At some point one of the neighbors, Randy Orbesen, agreed to grant Debtors an easement to use his power pole, but then he changed his mind.[2] Another neighbor, Patricia Clark, likewise agreed to grant Debtors an electrical easement to use her power pole, but then decided not to. The cost of running power from any other source was prohibitive. After 5-8 months of trying to figure out an affordable power source for the Field Pump, Debtors gave up. By the end of 2013, Debtors were resigned to the fact that they would never get their newly-purchased field irrigation system running. The siderolls sat idle in the field from the day the Debtors took delivery of them.

---

[2] Debtors' relationships with their neighbors, particularly it seems with Mr. Orbesen, were marred with animosity. Sometime in 2013, Debtors and the Orbesens had a dispute over Debtors' use of water from the irrigation ditch. The dispute led to litigation, which resulted, inter alia, in a state court enjoining the Orbesens from entering the Aztec Property.

At some point in 2015, Mr. Waggoner discovered that both Mover motors had been damaged (he suspects they were vandalized). The motors were inoperable and could not be repaired. Later in 2015, in a feed store in Carlsbad, New Mexico, Mr. Waggoner met a man who dealt in used irrigation equipment. Mr. Waggoner could not recall the man's name. In an ensuing discussion, Mr. Waggoner sold the broken Movers to the man "for parts." The man paid about $250 in cash for each Mover. Mr. Waggoner agreed that the buyer could pick the Movers up at his convenience.

Mr. Waggoner discovered in late 2016 or early 2017 that water had frozen in the Field Pump, damaging it beyond repair. Deeming it worthless, Mr. Waggoner threw the Field Pump away.

Debtors filed this case under chapter 13 on May 30, 2017. Shortly thereafter, Debtors replaced the small gas pump with a similar pump that cost about $150-$200 (the "Gas Pump").

Debtors did not list any irrigation equipment on their original bankruptcy schedules. Three months later, on September 28, 2017, Debtors filed amended schedules that listed "Side roll/walker (2) sprinkler & 2 [inch] Pump."

Debtors converted this case to chapter 7 on February 7, 2018 (the "Conversion Date"). On the Conversion Date, Debtors owned the Gas Pump and had possession of the Movers. The Field Pump had been discarded.

In June 2018 the chapter 7 trustee agreed, subject to Court approval, to allow Debtors to keep the Aztec Property if Debtors paid the estate $20,000. The agreement was based on the estimated value of the property ($309,000), less the mortgage balance ($125,598), Debtors' homestead exemption ($120,000), and estimated sales costs if the trustee sold the property to

-3-
Case 17-11381-t7    Doc 262    Filed 11/20/20    Entered 11/20/20 10:29:23 Page 3 of 11

someone else ($24,720). The trustee filed a motion to approve the agreement. A creditor objected, arguing that the Aztec Property was worth $390,000. The trustee eventually withdrew the motion.

In late 2018, the Carlsbad buyer picked up the broken Movers he had purchased in 2015.

On December 12, 2018, the trustee signed an agreement to sell the Aztec Property to the Orbesens for $380,000. Because of the state-court injunction prohibiting the Orbesens from entering the Aztec Property, they could not inspect the property before buying it. The agreement provided that the property was sold to the Orbesens "as is where is." Certain personal property was part of the deal, including: "1 Wheel Row [sic] Irrigation System with well and irrigation pumps . . . to the extent it is at the Property and the bankruptcy estate has an interest in it."

The trustee filed a motion to approve the sale to the Orbesens. After litigation about a proposal to pay a creditor a "finder's fee," the Court approved the sale on August 14, 2019. Debtors moved out in mid-October 2019, taking the Gas Pump with them.

After taking possession, Mr. Orbesen discovered that the Movers, the Field Pump, and the Gas Pump were missing. Mr. Orbesen contacted the trustee to complain about the missing items. The trustee, in turn, contacted Debtors to make inquiry, but he was not satisfied with Debtors' responses. On December 6, 2019, the trustee filed a motion to take Mr. Waggoner's Rule 2004 examination about the missing equipment, stating, inter alia, that "the Purchase Agreement and Order imposed obligations on the Trustee to provide the personal property in question to the buyers to the extent it was at the Aztec Property." The Court granted the Rule 2004 motion.

The trustee examined Mr. Waggoner under oath on February 8, 2020. The turnover motion followed on April 30, 2020.

Mr. Waggoner and Mr. Orbesen were the only witnesses at the final hearing on the trustee's turnover motion. Mr. Orbesen testified about the equipment's replacement cost. He opined that it

would cost about $10,000 to replace the Field Pump, about $5,000 to replace the Mover, and $600-$800 to replace the Gas Pump. Mr. Waggoner testified to the facts set out above.

B. <u>Governing Law</u>.

When a debtor files a bankruptcy case, an estate is created. § 541(a).[3] With exceptions not relevant here, the estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." § 541(a)(1). The scope of § 541(a) is broad, and "property of the estate" encompasses "all kinds of property"— "tangible or intangible," and all kinds of interests—even those that are "novel or contingent." *In re Trudeau*, 237 B.R. 803, 805 (10th Cir. BAP 1999).

Under § 521(a)(4), the debtor has a duty to surrender to the case trustee all property of the estate. In most chapter 7 cases, of course, debtors do not actually give any property to the case trustee, so the "surrender" is symbolic. *See* 4 Collier on Bankruptcy ¶ 521.16:

> As a practical matter, in most consumer chapter 7 cases, the debtor surrenders only constructive possession of property to the trustee, unless the trustee demands that physical possession also be surrendered . . . . Unlike the duty of a third party holding property of the estate to turn over that property under section 542, the debtor's duty is simply to relinquish the debtor's rights in property to the trustee, and to cooperate with the trustee's efforts to take possession of it should the trustee choose to do so.

If the trustee needs to take possession of estate property, a debtor's duty to surrender is "effectively implement[ed]" by § 542(a), which provides that "an entity . . . in possession, custody, or control, *during the case*," of property of the estate "shall deliver to the trustee . . . such property or the value of such property[.]" *In re Auld*, 561 B.R. 512, 518 (10th Cir. BAP 2017).

In a converted chapter 13 case, estate property is "property of the estate, as of the date of filing of the petition, that remains in the possession of or is under the control of the debtor on the

---

[3] Unless otherwise indicated, all statutory references are to 11 U.S.C.

date of conversion[.]" § 348(f)(1)(A). This means that property of the converted chapter 7 estate does *not* include any property Debtors' acquired during the chapter 13 phase of their bankruptcy. *See, e.g., In re Barrera*, 2020 WL 5687228 at *2 (Bankr. D. Colo.):

> Congress has given the debtor who attempts to repay his debts in chapter 13, albeit unsuccessfully, a sort of guarantee that he will be no worse off for having tried a repayment plan, as long as he converts in good faith. This guarantee comes in the form of allowing the debtor to retain his postpetition assets, which of course he would never have had to contribute if he had originally filed a chapter 7 case.

*See also* 3 Collier on Bankruptcy ¶ 348.07[1] (property acquired during the chapter 13 is not part of the converted chapter 7 estate; a contrary rule would create a serious disincentive to file a chapter 13).[4]

If a debtor fails to turn over estate property, the trustee may file a motion to compel turnover. *See, e.g., In re Reeves*, 509 B.R. 35, 57 n.42 (Bankr. S.D. Tex. 2014) (typically an adversary proceeding is necessary to recover money or property, but if the trustee seeks turnover from the debtor, he may do so by filing a motion); Fed. R. Bankr. P. 7001(1) ("a proceeding to recover money or property, *other than a proceeding to compel the debtor to deliver property to the trustee*" is an adversary proceeding) (emphasis added).

A debtor does not have to have current possession of estate property to be liable to the trustee for its value. For example, if a debtor had estate property but took action to place it beyond the reach of the trustee, she would be liable to the trustee for the value of the property. *See, e.g., In re Ruiz*, 455 B.R. 745, 752-53 (10th Cir. BAP 2011) (debtors who wrote prepetition checks to be drawn from funds in their bank account, which were not cashed by the payees until after the bankruptcy was filed, had "control" over the funds "during the case" such that they could be

---

[4] The rule is different if the debtor is found to have filed the chapter 13 in bad faith. *See* § 348(f)(2). There is no allegation that Debtors filed their chapter 13 case in bad faith.

subject to turnover because they could have cancelled the checks or closed the bank account); *In re Auld*, 561 B.R. at 519 ("While some courts hold that the trustee must demonstrate that the debtor currently possesses the property the trustee seeks, possession 'during the case' is all that is required."); *In re Pilate*, 487 B.R. 345, 348-49, 352 (Bankr. D.D.C. 2013) (debtor liable to the trustee for inherited funds that were estate property but were spent by the debtor); *see also In re Soundview Elite Ltd.*, 543 B.R. 78, 97 (Bankr. S.D.N.Y. 2016) (§ 542(a) provides "what is in substance a federal right of replevin—a right to recover the estate's property in kind, with the ability to get the value of the property as a substitute").

C. Turnover Motions

To prevail in a motion for turnover, the movant must show the property in question (1) is presently, or was during the bankruptcy case, in the possession, custody, or control of the debtor; (2) can be used, sold, or leased in accordance with the provisions of § 363; and (3) has more than inconsequential value to the estate. *In re Bailey*, 380 B.R. 486, 490 (6th Cir. BAP 2008) (collecting cases).[5] The movant has the burden of proving each of these elements by a preponderance of the evidence. *Id.*; *In re Alofs Mfg.*, 209 B.R. 83, 89-91 (Bankr. W.D. Mich. 1997) (stating that the burden of proof is on the movant and concluding, after a lengthy analysis of pre-Code law, that a "preponderance of the evidence" standard applies rather than a "clear and convincing" standard); *accord In re U.S.A Diversified Prods., Inc.*, 193 B.R. 868, 872 n.3 (Bankr. N.D. Ind. 1995). If the trustee presents a prima facie case for turnover, the burden of proof shifts to the nonmovant. *In re Rubesh*, 347 B.R. 115, *3 (10th Cir. BAP 2006) (unpublished).

D. Was the Equipment Property of the Chapter 7 Estate?

---

[5] Although § 542(a) does not identify the "property" that is subject to turnover, it is generally understood to be property of the estate. Collier, *supra* ¶ 542.03[2]; § 541(a)(1).

Field Pump. There is no question Debtors acquired the Field Pump prepetition. The evidence is uncontroverted, however, that Debtors also disposed of the Field Pump prepetition. The Field Pump therefore was not property of the chapter 13 estate or the chapter 7 estate.

Movers. It is hard to credit Mr. Waggoner's testimony that he sold the Movers to a stranger he met in a Carlsbad feed store in 2015, or that the stranger bought the Movers sight unseen for $500 cash, or that the stranger waited three years to pick the Movers up. On the other hand, the testimony is uncontroverted. Assuming Mr. Waggoner's version of events is accurate, the question remains whether the Movers were estate property on the Conversion Date.

In New Mexico, the sale of goods is governed by the Uniform Commercial Code, NMSA § 55-1-101 et seq. (the UCC). NMSA § 55-2-401(2), which governs the passing of title in a sale of goods, provides in relevant part:

> unless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest[.]

One term of Mr. Waggoner's agreement with the Carlsbad stranger was that Waggoner retained possession of the Movers until the buyer picked them up. As the pickup apparently occurred in late 2018, the Movers were estate property on the date of conversion. *See, e.g., In re Surplus Furniture Liquidators, Inc. of High Point*, 199 B.R. 136, 139–40 (Bankr. M.D.N.C. 1995) (interpreting section 2-401(2) of the UCC to hold that furniture that was sold prepetition, but delivered to buyers postpetition, was estate property).

NMSA, § 55-2-402(2), governing the rights of a seller's creditors against sold goods, provides:

> A creditor of the seller may treat a sale or an identification of goods to a contract for sale as void if as against him a retention of possession by the seller is fraudulent under any rule of law of the state where the goods are situated, except that a retention of possession in good faith and current course of trade by a merchant-

-8-
Case 17-11381-t7    Doc 262    Filed 11/20/20    Entered 11/20/20 10:29:23 Page 8 of 11

seller for a commercially reasonable time after a sale or identification is not fraudulent.

This provision generally is understood to codify the common law "ostensible ownership" doctrine, i.e., that with respect to third parties, "the passing of a property interest must be . . . 'objectively determinable.'" *Death and Transfiguration: The Myth That the U.C.C. Killed "Property,"* 69 Temp. L. Rev. 1281, 1321 (1996). An early version of the Official Comment to § 2-402(2) of the UCC read: "the presence or absence of externally observable and determinable facts and not the location of 'title,' controls the rights of the seller's creditors and of good faith purchasers from either the buyer or the seller". *Id.* In other words, "[p]roperty interests that are not open and notorious should be deemed constructively fraudulent against creditors." *In re Clean Burn Fuels, LLC*, 492 B.R. 445, 458-59 (Bankr. M.D.N.C. 2013).

Debtors had possession of the siderolls on the Conversion Date and disclosed them to the trustee via their amended schedules. Under these circumstances, the trustee's right to the Movers would defeat the Carlsbad buyer's claim to them. *See* Collier, *supra*, ¶ 541.05[4] (under UCC 2-402, the trustee's right to estate property may defeat a claim of a buyer if the debtor retained possession of the sold goods). The Movers were property of the chapter 7 estate.

Gas Pump. Mr. Waggoner testified that he purchased the Gas Pump in the spring of 2017, postpetition but pre-conversion. Under § 348(f)(1)(A), the Gas Pump is not property of the chapter 7 estate.

E.  Debtors' Possession, Custody, or Control of the Equipment.

Debtors had possession, custody, or control over the Movers and the Gas Pump on the Conversion Date. The trustee carried his burden of proving this element.

F.  The Equipment Could be Used, Sold, or Leased.

The subject equipment clearly falls within § 363's grant of authority to a trustee to use, sell, or lease it. This otherwise simple fact may be brought into question by the trustee's apparent proposal to give the Orbesens anything he recovers from Debtors.[6] The way the Court reads the purchase agreement, the trustee does not have to do that unless the equipment was on the Aztec Property on December 12, 2018. The Field Pump was not, the Gas Pump was, and the Movers may or may not have been, depending on when in late 2018 the buyer picked them up. Regardless of whether the trustee needs the equipment to settle with the Orbesens or to sell for cash, however, he has satisfied this element with respect to the Gas Pump and a Mover.

G.  Does the Equipment Have More than Inconsequential Value to the Estate?

Section 542 "is silent concerning the moment in time" a property's value is measured. *In re Cantor*, 2008 WL 4561504, *8 (Bankr. W.D. Pa.). One court held that "the value of relevance is the value at the time when delivery is supposed to occur." *In re Lang*, 437 B.R. 70, 72-73 (Bankr. W.D.N.Y. 2010) ("For cases in chapter 7, the obligation to deliver and account will first arise upon the appointment of the trustee."). Under that standard, the relevant value in a converted chapter 13 case is the "value of the assets as of the date of conversion from chapter 13." *Id.* at 72.[7] At least for the purpose of this contested matter, the Court concludes that the Conversion Date is the appropriate date to value the equipment.

Field Pump. The Field Pump was never estate property, was worthless on the Conversion Date, and was not sold to the Orbesens. It is of inconsequential value to the estate.

---

[6] The trustee does not admit as much at the hearing but there is no other explanation for the motion, following as it did the correspondence among the trustee, Mr. Orbesen, and Mr. Waggoner.

[7] Another court held that the pertinent valuation date is "when the turnover action is tried." *In re Cantor*, 2008 WL 4561504, *8. Some courts consider the value of the property as of the petition date. *In re Sipe*, 2018 WL 5748630, *6 (E.D. Cal.); *In re Marcella*, 2009 WL 3348251, *11 (Bankr. D. Mass.); *In re McWhorter*, 37 B.R. 742, 744 (Bankr. D.S.C. 1984).

Movers. The evidence in the record is that Mr. Waggoner bought each Mover for $3,150 in September 2012 and sold each for $250 in 2015, and that a new mover would cost about $5,000 today. What the record lacks is evidence of the value of a used, neglected, broken Mover on the Conversion Date. The Court cannot make a finding on that key issue that would be better than guesswork. If Debtors still had a Mover in their possession, the Court would order it turned over to the trustee, to help him settle any potential breach of contract claim the Orbesens may be threatening. Because that is not an option, however, the only remedy is a money judgment for the value of a Mover on the Conversion Date. Without evidence of that value, no judgment can be entered. The trustee did not carry his burden of proving that a Mover had more than inconsequential value on the Conversion Date.

Gas Pump. Finally, the Gas Pump may have consequential value to the estate if it could help settle a dispute with the Orbesens, but the Gas Pump is not property of the chapter 7 estate and therefore is not subject to turnover.

## Conclusion

The Movers were property of the estate on the Conversion Date, but the trustee did not carry his burden of proving that they had more than inconsequential value on that date. The Field Pump and the Gas Pump were not estate property on the Conversion Date, so Debtors have no obligation to turn them over. The trustee's motion will be denied by separate order.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: November 20, 2020
Copies to: counsel of record